**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| HEIRS OF NOEL POPE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 24-1873 |
| | ) | |
| v. | ) | Filed: April 28, 2026 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiffs are a group of American Indians who have inherited or may inherit mineral interests in an approximately 80-acre allotment of land in Eastern Oklahoma ("the Allotment") from their common ancestor, Noel Pope.  They allege that the federal government breached its trust duties by failing to properly protect their interests in relation to a 2022 proceeding in which the District Court of Pittsburg County, Oklahoma, approved an oil and gas lease between Reagan Smith, Inc. ("Reagan Smith"), an oil and gas company, and certain on the Allotment's mineral owners.  They also allege such approval amounted to a Fifth Amendment taking, or alternatively, an illegal exaction.  Defendant moved to dismiss Plaintiffs' Amended Complaint for lack of jurisdiction and failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  As explained below, because Plaintiffs fail to demonstrate jurisdiction under the Indian Tucker Act or on a breach-of-trust theory and because they fail to state viable takings or illegal exaction claims, Defendant's motion to dismiss is **GRANTED**.

## I.   BACKGROUND

### A.   Factual Background

In 1887, Congress passed the General Allotment Act, which authorized the federal government to convert communal tribal land into individually owned private parcels called allotments.  *See* Pls.' Am. Compl. ¶ 8, ECF No. 6; *see also* General Allotment Act of 1887, ch. 119, 24 Stat. 388; *United States v. Mitchell*, 445 U.S. 535, 542–44 (1980) (describing the statutory allotment policy as "allot[ing] to each Indian residing on a reservation up to 80 acres of agricultural land or 160 acres of grazing land found within the reservation").  Noel Pope, whose heirs now bring suit in this Court, received a restricted-fee allotment in 1903.  ECF No. 6 ¶¶ 10–11.  The Allotment consists of 79.13 acres and is located in Pittsburg County, Oklahoma.  *Id.* ¶ 11.

Following Mr. Pope's death in 1954, the Pope family lost all of the surface interest and a portion of the mineral interest in the Allotment as the result of a sherriff's sale in 1959, with the remainder of the mineral interest going to five of Mr. Pope's heirs.  *Id.* ¶ 32.  This remaining mineral interest in the Allotment is now owned by 84 descendants of Mr. Pope who have varying fractional interests based on their relation to their common ancestor.  *Id.*; Oral Arg. Tr. at 43:10–23, ECF No. 17 (representing that there are 84 total mineral owners).  The Allotment was subject to various oil and gas leases from 1930 to 2006, when the most recent lease prior to the lease at issue expired.  ECF No. 6 ¶¶ 12–16.

In Oklahoma, oil and gas leases on restricted allotments belonging to members of the Five Civilized Tribes are governed by the Act of 1947, commonly known as the Stigler Act.  *See* Act of August 4, 1947 ("Stigler Act"), Pub. L. No. 80-336, 61 Stat. 731.[1]  The Act requires that any

---

[1] The Stigler Act was amended in 2018 to eliminate the blood quantum requirement to own land in restricted status, *see* Stigler Act Amendments of 2018, Pub. L. No. 115-399, 132 Stat. 5331,

conveyance—including an oil and gas lease—of interests in a restricted allotment be approved by the Oklahoma district court in the county in which the land is situated.[2] *Id.* § 1(a). The Act also sets forth the procedure by which mineral owners and prospective lessees must obtain the necessary court approval. First, the mineral owners or the prospective lessee must file a petition for approval of the lease with the appropriate state district court. *Id.* § 1(b). Next, notice of the lease approval hearing, which must be set at least 10 days after the filing of the petition, is required to be published in the county newspaper. *Id.* Written notice of the hearing must also be given to a trial attorney[3] of the Department of the Interior in the district in which the petition is filed (in this case, the Tulsa Field Solicitor's Office) at least 10 days in advance of the hearing date. *Id.*

At the hearing itself, the state district court judge has discretion to approve or conditionally approve the lease if it is in the best interests of the mineral owners, or it may withhold approval. *Id.* § 1(c). The mineral owners, referred to in the Act as "grantors," seeking to lease their interest to the oil and gas company must be present unless they consent in writing with the trial attorney that the lease can be approved in their absence. *Id.* § 1(b). The Stigler Act requires the court to ensure that the consideration for the lease is paid in full. *Id.* The Act also allows the trial attorney to appeal "any order approving conveyances" in accordance with Oklahoma law. *Id.* § 1(e).

---

but the relevant statutory language for the purposes of this case remains the same. For ease of reference, this opinion will cite the 1947 version of the Act.

[2] Although this opinion refers specifically to oil and gas leases, the Stigler Act's approval procedure applies to any conveyance of any interest in restricted land in Oklahoma belonging to members of the Five Civilized Tribes, not just mineral leases.

[3] While the Stigler Act references a "probate attorney," the United States Court of Appeals for the Tenth Circuit has recognized that Interior Department trial attorneys appearing in Stigler Act proceedings are "successor[s] to the United States Probate Attorney[s]." *Magnan v. Trammell*, 719 F.3d 1159, 1175–76 (10th Cir. 2013).

The requirements of the Stigler Act are the main subject of this lawsuit.  In 2022, Reagan Smith sought to enter into oil and gas leases with the mineral owners of the Noel Pope allotment.  ECF No. 6 ¶ 21.  The leasing manager of Reagan Smith sent a letter on March 14, 2022, to the Allotment's mineral owners (although it is unclear how many) with "an initial offer" of a $200 per acre bonus payment[4] and a 3/16th royalty over a three-year lease term.  *Id*.  The leasing manager enclosed a lease, a verification form, and a W-9 form, and asked the mineral owners to sign the three forms and return them to Reagan Smith in a postage-paid envelope.  *Id.*

On the same day—March 14, 2022—an attorney representing Reagan Smith filed a petition with the District Court of Pittsburg County, Oklahoma, for the approval of an oil and gas lease for the Allotment, naming 58 petitioners who are descendants of Noel Pope.  *Id.* ¶ 17.  Appended to the petition was a notarized verification form representing that "the facts and matters therein contained are true and correct," which was signed by one of the 58 petitioners.  *Id.* ¶ 18.  The court set a hearing date for June 22, 2022.  *Id.* ¶ 20.  The court's Notice of Hearing stated that the three-year lease to Reagan Smith would include a bonus payment of $200 per acre for each petitioner and a 3/16th royalty in accordance with each respective petitioner's interest in the property.  *Id.* On April 4, 2022, the Reagan Smith attorney filed an amended petition with the court, removing the names of four petitioners and adding 17 others.  *Id.* ¶ 22.

On April 12, 2022, an Interior Department attorney ("Trial Attorney") entered her appearance in the case.  *Id.* ¶ 23.  Her Combined Entry of Appearance and Acknowledgement of

---

[4] The Court understands the bonus payment as a one-time upfront payment made to mineral owners entering into the oil and gas lease.  The bonus payment is separate from the royalty payments made under the lease, which are ongoing and dependent on the amount of oil and gas produced from the Allotment.  *See, e.g.*, Order at 20, ECF No. 8-5 (Def.'s Ex. 5) (state court order describing bonus payments as "cash bonus consideration" and, separately, noting a 3/16th royalty payment to lessors).

Notice stated that her role, pursuant to the Stigler Act, was "to protect the interests of the Indian Petitioners owning restricted land." *Id.*  On April 28, 2022, she sent a letter to a number of the Allotment's mineral owners (although it is unclear how many) introducing herself as having "been assigned to protect [their] restricted Indian interests" and explaining that "[a]ll mineral leases signed by restricted Indian owners must be approved in state court in the county where the property is located." *Id.* ¶ 24; April 28, 2022 Letter at 2–4, ECF No. 8-3 (Def.'s Ex. 3).  She advised them of the hearing date and time, and enclosed an appraisal of the land, which found "the value of the mineral interest in this tract to be \$200/acre, with a 3/16[th] royalty, for a 3-year term."  ECF No. 8-3 at 2.  The Trial Attorney then stated that she successfully negotiated with Reagan Smith` to increase the bonus payment to \$500 per acre.  *Id.*  She directed the petitioners to sign a lease and the verification of the lease approval petition—which the Reagan Smith attorney previously sent them—before a notary prior to the hearing so that they could be included in the court's approval of the lease.  *Id.* at 3.  She also urged them to contact her if they did not wish to enter into the lease so that she could discuss with them "the possible consequences of deciding not to lease when [their] co-owners have executed leases."  *Id.*

In the letter, the Trial Attorney also invited petitioners to attend the hearing.  *Id.*  She told petitioners that if they did not plan to attend, she would appear on their behalf, but that they had to return an enclosed Owner's Statement Concerning Oil and Gas Lease of Restricted Property so that her office had written documentation that the absent petitioners consented to the hearing being held in their absence.  *Id.*  The Trial Attorney advised that Reagan Smith would mail the bonus payment to any absent petitioner within a few business days of the hearing.  *Id.* at 4.  Finally, she explained that petitioners had a right to a private attorney, although the federal government would not pay for a private attorney's services.  *Id.*

On June 3, 2022, the Reagan Smith attorney filed a second amended petition with the court, adding 14 more petitioners.  ECF No. 6 ¶ 25.  Appended to the petition were additional verification forms from 11 petitioners.  *Id.* ¶ 26.  On June 22, 2022, the District Court of Pittsburg County, Oklahoma, held the lease approval hearing.  *Id.* ¶ 28.  Prior to the hearing, the Trial Attorney signed a Consent to Hearing statement affirming that she consented to a hearing on behalf of 17 listed individuals who were not present.  *Id.* ¶ 27.  According to the transcript of the hearing, three petitioners were present.  *See* Tr. of Approval Hr'g at 5, ECF No. 8-4 (Def.'s Ex. 4).

During the hearing, the Trial Attorney introduced herself as "[r]epresenting the Secretary of the Interior for the protection of the Indian interest pursuant to section 1 in the Act of August 4th, 1947 [the Stigler Act]."  *Id.* at 4.  The Reagan Smith attorney represented to the court that there were 20 leases pending approval as of that date.  *Id.* at 5–6 (identifying 17 petitioners' names, in addition to the three petitioners present in the courtroom, for a total of 20 petitioners).  The Reagan Smith attorney told the court that there were "over 30 other owners," but indicated that Reagan Smith had "been unable to contact them, or had no response to our efforts to lease them [sic]."  *Id.* at 6.  She represented to the court that "if we were to get more leases, we would file a new proceeding at a later date."  *Id.*  She then read the checks written to each of the 20 petitioners into the record.  *Id.* at 7–8.

On the same day, the state court judge signed an Order Approving Oil and Gas Lease ("2022 Order").  *See* Order at 2–22, ECF No. 8-5 (Def.'s Ex. 5).  The 2022 Order listed the names of 84 petitioners, but 64 of those names were crossed out by hand, leaving a total of 20 petitioners remaining.  *Id.* at 2–4.  It confirmed that the petitioners consented to the hearing even though not all of them were present, and that the Trial Attorney represented their interests at the hearing.  *Id.* at 4.  In the order, the court made the following finding:

6

> The Court . . . finds the Petitioners have executed their Oil and Gas Leases covering all their right, title and interest in and to the lands here involved in favor of Reagan Smith, Inc., for a primary term of three years from date of approval, and as long thereafter as oil, gas and other minerals are produced in paying quantities, for a cash bonus consideration of $200.00 per acre, paid-up, and a 3/16th royalty to lessor as provided in the Oil and Gas Lease. Said Oil and Gas lease was offered for sale at public auction in open court and that Reagan Smith, Inc. was the highest and best bidder therefor, having bid the sum of $502 per acre, including delayed rental, for said Oil and Gas Lease for a term of three years from date of approval, and in addition thereto, the costs of this approval proceeding and attorney fees.

*Id.* at 20. The court further found that the "sale was conducted fairly and the sum bid is not disproportionate to the value of the leased interests," and noted that the Trial Attorney did not object to the lease approval. *Id.* The court also stated that "[i]f any of the above listed petitioners have not executed all documents necessary to vest the Court with jurisdiction or to satisfy the requirements of the Field Solicitor, their leases are conditionally approved subject to furnishing the required documentation." *Id.* at 21. Finally, the court noted that certain petitioners "may wish to have their bonus payment checks deposited in their 25 C.F.R. [§] 115.701 Individual Indian Money Accounts," and if so, the court ordered the Secretary of the Interior ("the Secretary") to accept for deposit those bonus payment checks. *Id.* at 22.

On September 8, 2022, Reagan Smith's attorney filed proof of delivery of payment to 15 petitioners who did not attend the proceeding in person, five of whom are plaintiffs in this lawsuit. ECF No. 6 ¶ 37. On June 16, 2023, she filed proof of delivery of payment for two more absent petitioners, one of whom is a plaintiff in this lawsuit. *Id.* ¶ 38.

### B.    The Present Litigation

Plaintiffs filed a Complaint in this Court on November 14, 2024, naming 16 individuals and the Heirs of Noel Pope as plaintiffs. *See* Pls.' Compl., ECF No. 1. Before Defendant responded, they filed an Amended Complaint on February 21, 2025, adding three additional individuals as plaintiffs. *See* ECF No. 6. Plaintiffs bring their claims both as 19 individuals

7

("Individual Plaintiffs") under the Tucker Act and as an alleged identifiable group of American Indians ("Litigation Group")—which includes the 19 individuals, plus 39 other heirs of Mr. Pope, totaling 58 members in all—under the Indian Tucker Act. *Id.* ¶ 6. Each of the 19 Individual Plaintiffs "either owns, or is expected to inherit, an interest in the mineral estate" of the Allotment. *Id.* Six of these individuals entered into leases with Reagan Smith ("Leasing Plaintiffs"), while 13 did not ("Non-Leasing Plaintiffs").[5] *Id.* ¶¶ 37–38 (indicating the six individuals for whom Reagan Smith filed proof of payment for their respective bonus payments). The 39 additional members of the Litigation Group are "lineal descendants of Noel Pope" who "expressed a desire to join this lawsuit to advocate for their collective rights as an extended family." *Id.* ¶ 6 n.1. Regardless of their present or future interest, all members of the 58-member Litigation Group "share a family and cultural connection to the Noel Pope Allotment." *Id.* ¶ 6.

Plaintiffs allege five counts. The first three counts are for breach of trust based on Defendant's alleged failure to (1) adequately represent owners of the Allotment in relation to the 2022 lease approval proceeding, (2) ensure proper and timely oil and gas lease payments to all owners of the Allotment, and (3) properly manage oil and gas lease payments related to the Allotment. *Id.* ¶¶ 42–59. Counts IV and V, which are brought only by Non-Leasing Plaintiffs, allege an unconstitutional taking by Defendant under the Fifth Amendment or, in the alternative, an illegal exaction under the theory that Defendant unlawfully divested Non-Leasing Plaintiffs of their property interest in the Allotment. *Id.* ¶¶ 60–70. Plaintiffs seek a declaration that Defendant is liable for their injuries and losses, an order requiring Defendant to produce an accounting of the

---

[5] Six of the Non-Leasing Plaintiffs' interests in the Allotment have not yet been probated, so they do not presently have an established interest. ECF No. 6 ¶ 6 (identifying the estates of Pauline Starr, Darcey Fields, Nashoba Harrison, John Pope, Alburey Doss, and LaTavia Doss as not yet probated).

monies derived from the Allotment and the disposition of such monies, a determination of damages owed, an order directing Defendant to pay such damages, and fees and costs.  *Id.* ¶ 71.

As for Count I, Plaintiffs contend that Defendant breached its trust duties because the Trial Attorney representing the interests of the Allotment's mineral owners did not object to Reagan Smith's attorney filing the petition and amended petitions on their behalf; did not ensure that all owners of the Allotment consented to the petition or were removed as petitioners; did not sufficiently advise Plaintiffs as to their property rights and procedural options; and sent the April 28, 2022 letter to some or all of the mineral owners at least six weeks after the petition was filed.[6] *Id.* ¶¶ 43–45, 48–49.  Plaintiffs assert that the Trial Attorney had a "statutory duty" to "counsel and advise all allottees, adult or minor, having restricted lands of all of their legal rights with reference to their restricted lands, without charge, and to advise them in the preparation of all leases authorized by law to be made . . . ."  *Id.* ¶ 46 (citing Act of May 27, 1908 ("Act of 1908"), Pub. L. No. 60-140, 35 Stat. 312, 314).  In Plaintiffs' view, the Trial Attorney failed to meet this obligation because, for example, she represented to Plaintiffs that she negotiated a $500 per acre bonus payment, but did not ensure that the final petition and 2022 Order, which recited a $200 per acre bonus payment, reflected the agreement.  *Id.* ¶ 48.

Under Count II, Plaintiffs argue that it was also a breach of trust for Defendant not to ensure some type of payment was made "to *all* of the allotment owners," including Non-Leasing

---

[6] Plaintiffs initially alleged that Defendant breached its trust duty because Plaintiffs "had no interaction with any federal official concerning the preparation and filing of the Petition, Amended Petition, and Second Amended Petition, and Plaintiffs did not give their informed consent for the Petition to be filed on their behalf."  ECF No. 6 ¶ 47.  In their opposition brief, Plaintiffs retracted this allegation in part and acknowledged that the Trial Attorney did not contact the mineral owners before the lease petition was filed because the Trial Attorney was not aware of the petition before receiving notice of its filing.  *See* Pls.' Resp. to Mot. to Dismiss at 19, ECF No. 10 (agreeing with Defendant's statement that under the Stigler Act "there is no duty to represent a mineral estate owner before the Trial Attorney receives notice and is aware of a lease petition").

Plaintiffs. *Id.* ¶ 52 (emphasis in original). Plaintiffs allege that both the Trial Attorney and the state court judge were "officials with federal trust duties to be exercised for the benefit of Plaintiffs and the other owners of the Noel Pope Allotment." *Id.* ¶ 51. Thus, in Plaintiffs' view, the Trial Attorney or the judge should have either disapproved the lease because only 20 of the possible 84 grantors signed and accepted it, or ensured the lease had a provision including "some type of just compensation" for Non-Leasing Plaintiffs.[7] *Id.* ¶ 52. Plaintiffs allege that Non-Leasing Plaintiffs have not received any payment from Reagan Smith or any other oil and gas operator associated with the Allotment, and that Non-Leasing Plaintiffs are not aware that Defendant has been "demanding, collecting, depositing, managing, investing, accounting, and reporting on any payments" on their behalf. *Id.* ¶ 54. Plaintiffs further allege that it was a breach of trust to allow the bonus payments to be made directly to Leasing Plaintiffs rather than requiring that such payments be made to Defendant and deposited in Individual Indian Money ("IIM") Accounts. *Id.* ¶ 56.

Plaintiffs' third and final breach of trust claim overlaps in part with Count II. Plaintiffs allege that Defendant breached its trust duty to Plaintiffs by failing to "collect payments, establish IIM accounts for all eligible Plaintiffs, and manage such IIM accounts for Plaintiffs' benefit, including the duty to keep Plaintiffs informed regarding Plaintiffs' accounts, for every day within the applicable statute of limitations." *Id.* ¶ 58. This claim encompasses payments from not only Reagan Smith but also from prior lessors of the Allotment's mineral estate during the last six years, which Plaintiffs allege should have been made to the Minerals Management Service ("MMS") at

---

[7] In their opposition, Plaintiffs clarify that they do not claim Defendant has a duty to disapprove leases that lack the consent of every fractional mineral interest owner. ECF No. 10 at 28. Rather, they allege it was a breach of trust and a violation of federal statute for Defendant to approve an oil and gas lease on a restricted Indian allotment without the provision of payments to Non-Leasing Plaintiffs. *Id.*; *see also id.* at 30–31.

the Interior Department according to the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. §§ 1701–1759. *Id.* ¶ 59. Plaintiffs take issue with the fact that any payments that have been made to the Allotment's mineral owners have been made via direct payment, which they allege can be "difficult to monitor and susceptible to abuse by the oil & gas operators." *Id.*

The final two counts relate only to Non-Leasing Plaintiffs. Count IV alleges under a Fifth Amendment takings theory that the state court's 2022 Order approving the oil and gas lease "without requiring Reagan Smith, Inc. to make any payments whatsoever," *id.* ¶ 65, to Non-Leasing Plaintiffs constituted "an unconstitutional taking of private property without just compensation," *id.* ¶ 67. Plaintiffs claim that the 2022 Order, although issued by a state court judge, was a "federal action" because it "was signed by an official designated to act on such orders by Congress through federal statute." *Id.* ¶ 62. Plaintiffs further allege that actions taken pursuant to the Stigler Act and other federal statutes evince a public policy of gas exploration and production, thus satisfying the Fifth Amendment's "public purpose" requirement. *Id.* ¶ 63.

In the alternative, Non-Leasing Plaintiffs claim in Count V that Defendant's actions constitute an illegal exaction. *Id.* ¶¶ 69–70. Plaintiffs contend that the 2022 Order divested Non-Leasing Plaintiffs of their property interest in the Allotment, and that "[n]o statute or federal regulation allows this uncompensated divestiture." *Id.* ¶ 70. On this theory, Plaintiffs insist that Defendant "illegally required" Non-Leasing Plaintiffs to give their mineral interests to Reagan Smith without just compensation. *Id.*

On March 21, 2025, Defendant moved to dismiss the Amended Complaint under RCFC 12(b)(1) and 12(b)(6). *See* Def.'s Mot. to Dismiss, ECF No. 8. Defendant first argues that the Court lacks jurisdiction over claims by the Litigation Group because members of that group are

11

members of or are eligible for enrollment in a currently recognized tribe and are therefore not an "identifiable group of American Indians" for purposes of the Indian Tucker Act. *Id.* at 23. Defendant next argues that Plaintiffs' breach of trust claims should be dismissed for lack of jurisdiction and for failure to state a claim because: (1) the duties Defendant allegedly violated in connection with the lease approval proceeding are not statutory trust duties, and Plaintiffs fail to allege any breach of the limited trust duties found in the Stigler Act, *id.* at 27–33; (2) there are no trust duties requiring the Government to obtain unanimous owner consent for oil and gas lease approvals for restricted allotments or to collect and deposit lease bonus payments in IIM accounts, *id.* at 33–39; and (3) there is no duty to unilaterally create IIM accounts for all plaintiffs, and FOGRMA does not apply here, *id.* at 39–43. Finally, Defendant urges the Court to dismiss Non-Leasing Plaintiffs' Fifth Amendment takings and illegal exaction claims because, under either theory, they have failed to allege a viable claim. *Id.* at 43–47.

Plaintiffs filed their response on May 2, 2025, and Defendant replied on May 30, 2025. *See* Pls.' Resp. to Mot. to Dismiss, ECF No. 10; Def.'s Reply in Supp. of Mot. to Dismiss, ECF No. 11. With the Court's leave, Plaintiffs filed a Surreply on June 13, 2025. *See* ECF No. 14. The Court held oral argument on December 9, 2025. *See* Min. Entry. The motion is therefore ripe for decision.

## II.  LEGAL STANDARDS

### A.    Jurisdiction of the Court of Federal Claims

Before reaching the merits of a plaintiff's action, the Court must as a threshold matter assure itself that subject-matter jurisdiction exists. RCFC 12(b)(1), (h)(3); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (affirming that subject-matter jurisdiction "'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception'" (quoting *Mansfield v. Swan*, 111 U.S. 379, 382 (1884))). If the Court at any point

determines that it lacks jurisdiction in a matter, the matter must be dismissed. *See* RCFC 12(h)(3). The plaintiff bears the burden of establishing, by the preponderance of evidence, the Court's jurisdiction over its claim. *See Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

The Tucker Act waives sovereign immunity for and provides the Court with jurisdiction over a limited set of claims against the United States. 28 U.S.C. § 1491; *United States v. Mitchell*, 463 U.S. 206, 216 (1983). Specifically, the Tucker Act grants this Court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act itself does not provide a cause of action. *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)). For that reason, to satisfy jurisdiction, plaintiffs "must identify a separate, money-mandating source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing *Mitchell*, 463 U.S. at 216–17).

Similarly, the Indian Tucker Act, 28 U.S.C. § 1505, provides for a limited waiver of the Government's sovereign immunity, granting the Court jurisdiction over "any claim against the United States . . . in favor of any tribe, band, or other identifiable group of American Indians" if such claim is either (1) "one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President," or (2) "is one which otherwise would be cognizable in the Court . . . if the claimant were not an Indian tribe, band or group." 28 U.S.C. § 1505. To establish Indian Tucker Act jurisdiction under a breach of trust theory, as Plaintiffs allege here, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and

13

allege that the Government has failed to faithfully perform those duties." *United States v. Navajo Nation* (*Navajo I*), 537 U.S. 488, 506 (2003). The plaintiff must further show that "the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties [that source of law] impose[s]." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015).

On a motion to dismiss for lack of jurisdiction under RCFC 12(b)(1), "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). If jurisdictional facts are disputed, the plaintiff may not rest on mere allegations; instead, he must produce competent proof sufficient to support his allegations by a preponderance of evidence. *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *see also Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985) (a court may consider "evidentiary matters outside the pleadings" when assessing a Rule 12(b)(1) dismissal).

### B.    Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plausibly state a claim upon which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet that standard, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Although a complaint need not contain detailed factual allegations to raise a plausible claim, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at

14

555; *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (holding that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

When assessing whether a plaintiff has stated a claim, the Court may consider the complaint itself, "the written instruments attached to it as exhibits, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Todd Constr., L.P. v. United States*, 94 Fed. Cl. 100, 114 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007)), *aff'd*, 656 F.3d 1306 (Fed. Cir. 2011).

### III. DISCUSSION

As a threshold matter, the Court does not have jurisdiction over the claims brought by the Litigation Group because the Heirs of Noel Pope, proceeding collectively, are not an "identifiable group of American Indians" within the meaning of the Indian Tucker Act.  As to the 19 Individual Plaintiffs, the Court concludes that Plaintiffs' Amended Complaint must be dismissed both for lack of jurisdiction and for failure to state a claim.  As Defendant correctly argues, Plaintiffs' allegations do not plead a breach by the United States of its duties under the Stigler Act or any other applicable federal law.  Nor do Plaintiffs plausibly allege that Defendant took a property interest or money from Plaintiffs with respect to the Allotment, which is necessary to state viable taking and illegal exaction claims, respectively.

### A.    The Court Lacks Jurisdiction Under the Indian Tucker Act Over the Litigation Group's Claims.

Plaintiffs allege that the Court has subject-matter jurisdiction over the Litigation Group's claims pursuant to the Indian Tucker Act.  The Indian Tucker Act grants a limited waiver of sovereign immunity, providing for the Court's jurisdiction over any claim against the United States brought by "any tribe, band, or other identifiable group of American Indians" "arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or . . .

15

which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group."  28 U.S.C. § 1505.  Plaintiffs assert that they fall into the third claimant category as an "identifiable group of American Indians" because they "all have an interest in the Noel Pope Allotment as descendants and heirs of Noel Pope."  ECF No. 6 ¶ 6.  The case law does not bear out Plaintiffs' claim of Indian Tucker Act jurisdiction.

The "controlling question" in determining whether a group of plaintiffs is permitted to assert claims as an "identifiable group of American Indians," within the meaning of the Indian Tucker Act, "is whether the claimant group can be identified and have a common claim." *Chippewa Cree Tribe of the Rocky Boy's Rsrv. v. United States*, 69 Fed. Cl. 639, 673 (2006) (quoting *McGhee v. Creek Nation*, 122 Ct. Cl. 380, 393 (1952)).  In assessing whether a group of Indian claimants meets this standard, courts have analyzed whether the plaintiffs are pressing a group claim or simply a collection of individual claims.

Decisions of courts that have found jurisdiction under the Indian Tucker Act demonstrate that "identifiable group of American Indians" is a specific phrase that is meant to allow groups of American Indians who are less formally organized than tribes and bands to file an action asserting their group rights.  One scenario in which this arises is when a tribe or band formerly existed but subsequently disbanded, and the group bringing the claims represents the interests of that nonexistent tribe or band.  *See id.* (finding that group formerly organized as the Pembina Band of Chippewa Indians was an "identifiable group" because their tribe, although then-disbanded, existed when their claim arose); *see also Snoqualmie Tribe of Indians v. United States*, 372 F.2d 951, 957 (Ct. Cl. 1967) (holding that the Skykomish tribe qualified as an "identifiable group" because, although it later went out of existence as a tribe, the claims being brought were "representative" of the tribe).  However, where a group still maintains formal organization as

16

members of a tribe or band, courts have declined to find Indian Tucker Act jurisdiction for a subgroup of that tribe or band. *See Osage Tribe of Indians v. United States*, 85 Fed. Cl. 162, 166 (2008) (reasoning that Indian Tucker Act jurisdiction was inappropriate because the proposed intervenors did not lack formal organization as a tribe—they were members of the Osage Nation— and the Osage Nation was already a party to the litigation representing their interests as constituents). In short, the focus is on whether the plaintiffs are seeking to represent the common interests of the purported group where there is no formal tribe or band that is presently doing so or can presently do so.

Decisions of courts that have not found jurisdiction under the Indian Tucker Act demonstrate that the phrase "identifiable group of American Indians" does not encompass plaintiffs who merely seek to press their individual rights, even if such rights spring from a common source. For instance, *Fields v. United States* found that five heirs of a deceased member of the Muskogee Creek Tribe of Indians who sought to recover oil and gas royalties generated from the decedent's property did not establish Indian Tucker Act jurisdiction because they brought the case as "individual Indians." 423 F.2d 380, 383 (Ct. Cl. 1970). In other words, that their claims all derived from their status as heirs of the same deceased American Indian did not make them an " identifiable group of Indians;" the rights they were pressing were individual rights. Similarly, in *Absentee Shawnee Tribe v. United States*, the court did not find Indian Tucker Act jurisdiction over claims by a subgroup of the Shawnee Tribe who were allegedly induced by the federal government to sell individual allotments from the tribe's land to white settlers for "nominal consideration." 165 Ct. Cl. 510, 513 (1964). The court emphasized that group rights must be affected for such jurisdiction to be proper; it is not enough for individuals to have similar claims.

17

*See id.* at 517 ("Improper inducement of an individual to exercise his right to an allotment might be an injury to him, but it would not trench upon any group rights.").

Plaintiffs have not demonstrated that Indian Tucker Act jurisdiction is proper here. As Defendant correctly argues, the Litigation Group is seeking to vindicate not a collective group right but rather a collection of related, but distinct, individual claims. ECF No. 8 at 25–26 (citing *Absentee Shawnee Tribe*, 165 Ct. Cl. at 517). Like the plaintiffs in *Fields*, it is not enough that the Litigation Group shares a common characteristic as descendants of Mr. Pope who have inherited or stand to inherit a fractional interest in the Allotment. *See* 423 F.2d at 383. The property interests they seek to protect are individual to each heir. And the claims they assert are not common among the group because they depend upon different facts, such as whether the heir has a present or future interest in the Allotment or whether he or she signed a lease with Reagan Smith. Because Plaintiffs have not alleged that Defendant's actions "trench[ed] upon any group rights," Indian Tucker Act jurisdiction is inappropriate. *Absentee Shawnee Tribe*, 165 Ct. Cl. at 517.

The case law on which Plaintiffs rely to establish Indian Tucker Act jurisdiction does not suggest that heirs of a common Indian ancestor can constitute an "identifiable group of American Indians." First, Plaintiffs argue that *Wolfchild v. United States*, 62 Fed. Cl. 521 (2004), establishes that Indian Tucker Act jurisdiction is proper for a group of lineal descendants of Indian beneficiaries. *See* ECF No. 10 at 12–13. Plaintiffs emphasize that the court in *Wolfchild* found jurisdiction even though the group was made up of members of several different federally recognized tribes. *See id.* Although it is similar in some respects to the case at hand, *Wolfchild* found Indian Tucker Act jurisdiction because the plaintiffs were descendants of an Indian group, the Mdewakanton Sioux, who no longer existed and thus could not represent the descendants' interests on their behalf. 62 Fed. Cl. at 540. Thus, as Defendant explains, the plaintiffs were

18

similar to members of a tribe that is no longer federally recognized.  *See* ECF No. 11 at 7 (citing *Wolfchild*, 62 Fed. Cl. at 540).  Here, the Litigation Group does not consist of members who are descendants of a tribe or other Indian group that no longer exists; rather, they simply share a common Indian ancestor and, as a result, an interest in the Allotment.  Thus, *Wolfchild* is inapposite.

Plaintiffs' reliance on a second case—*Birdbear v. United States*, 162 Fed. Cl. 225 (2022)—similarly misses the mark.  Although *Birdbear* analyzed whether the plaintiffs established jurisdiction under the Indian Tucker Act by examining whether their claims were based on a source of law that imposed specific fiduciary or other duties on the government and whether that source of law was money-mandating, the plaintiffs in that case only pled jurisdiction under the Tucker Act.  *See* Third Am. Compl. ¶ 14, *Birdbear v. United States*, No. 16-cv-00075-EDK (Fed. Cl. Aug. 6, 2018), ECF No. 147.  The court did not discuss, nor decide, whether the plaintiffs in *Birdbear* were an "identifiable group of American Indians" for the purpose of Indian Tucker Act jurisdiction.  Thus, *Birdbear* offers no support for finding Indian Tucker Act jurisdiction over the Litigation Group's claims.

Plaintiffs make a final argument in their Surreply, asserting that the plain language of the Indian Tucker Act supports their contention that they are an "identifiable group of American Indians."  ECF No. 14 at 5–6.  Though largely undeveloped in briefing, Plaintiffs also suggested at oral argument that because Plaintiffs are a group of American Indians, and because they are identifiable by their relation to Noel Pope, they should be considered an "identifiable group of American Indians."  ECF No. 17 at 43:1–9.  The issue with this approach is that it has no limiting principle.  By Plaintiffs' logic, any number of American Indians greater than one could be said to make up a "group," and any group could be said to be "identifiable" by any kind of characteristic

19

that they share.  As discussed above, while the case law recognizes that the phrase "identifiable groups of American Indians" was meant to expand jurisdiction to claims of unorganized or informal groups, it nonetheless suggests that the phrase is still tailored to groups of American Indians seeking to press their group rights.  *See Fields*, 423 F.2d at 383; *cf. Chippewa Cree*, 69 Fed. Cl. at 672.  In common parlance, the Litigation Group may be a "group," but it does not assert claims premised on a group right necessary to invoke Indian Tucker Act jurisdiction.

**B.    Plaintiffs Fail to Allege a Breach of Trust Claim Sufficient to Invoke the Court's Tucker Act Jurisdiction.**

Although the Court concludes that it does not have jurisdiction under the Indian Tucker Act to entertain claims by the Litigation Group, that finding does not preclude the Court from considering the same claims as to the 19 Individual Plaintiffs under the Tucker Act.[8]  The first three of the five claims asserted allege violations of Defendant's trust duties.

To determine the Court's jurisdiction over breach of trust claims under the Tucker Act, the United States Court of Appeals for the Federal Circuit applies a two-pronged test.  Under the first prong, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed to faithfully perform those duties."  *Navajo I*, 537 U.S. at 506.  "[A] statute or regulation that recites a general trust relationship between the

---

[8] Defendant does not contest that the Court has subject-matter jurisdiction under the Tucker Act over the claims asserted by the 19 Individual Plaintiffs.  *See* ECF No. 17 at 5:2–6 (acknowledging that case can go forward for 19 Individual Plaintiffs under the Tucker Act). However, the Court questions whether six of the 19 Plaintiffs, who stand to inherit an interest in the Allotment from a deceased family member whose estate is not yet probated, have a present legal interest sufficient to confer standing.  *See* ECF No. 6 ¶ 6 (identifying the not-yet-probated estates of deceased interest owners); *see also Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (explaining that to have standing "the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money").  But because the other 13 Individual Plaintiffs allegedly have a current legal interest in the Allotment, and therefore standing, dismissal is not warranted.  *Biden*, 600 U.S. at 489 ("If at least one plaintiff has standing, the suit may proceed." (citing *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006))).

United States and the Indian People is not enough to establish any particular trust duty." *Hopi Tribe*, 782 F.3d at 667. Rather, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo I*, 537 U.S. at 506. Under the second prong, the plaintiff must show that "the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties [that source of law] impose[s]." *Hopi Tribe*, 782 F.3d at 667.

All of Plaintiffs' breach of trust claims fail to satisfy the first prong of the relevant test.[9] Plaintiffs identify the Stigler Act as the principal source of law establishing trust duties that Defendant, in their view, failed to perform. *See* ECF No. 10 at 28–39. While the Stigler Act does impose some limited duties that could satisfy prong one of the *Navajo I* test, Plaintiffs do not allege that Defendant failed to fulfill those duties here. And Plaintiffs have not identified any other "treaty, statute, or regulation," *Arizona v. Navajo Nation*, 599 U.S. 555, 563–64 (2023), that establishes an obligation for the United States to take the actions Plaintiffs claim it should have taken. Although Plaintiffs attempt to support their claims by relying on other sources of law, such as the Act of 1908, the Act of January 26, 1933 ("Act of 1933"), Pub. L. No. 72-322, 47 Stat. 777, and FOGRMA, these statutes, too, do not satisfy prong one because they are either outdated or inapplicable. Accordingly, the Court lacks jurisdiction over Plaintiffs' breach of trust claims.

    1.    <u>The Stigler Act Does Not Impose the Duties that Plaintiffs Allege Defendant Breached.</u>

Count I alleges that the Trial Attorney's purported failure to adequately represent allotment owners in relation to the 2022 lease approval proceeding constituted a breach of Defendant's trust duties under the Stigler Act. To determine whether the Government owed a particular fiduciary

---

[9] Defendant does not advance at this stage of the litigation, and thus the Court does not consider, a prong-two argument. *See* ECF No. 17 at 6:22–8:12.

duty to Plaintiffs under the Stigler Act, "the analysis must train on specific rights-creating or duty-imposing . . . prescriptions" in the statute. *Navajo I,* 537 U.S. at 506. "[W]here the relevant statute cannot be fairly read as imposing the specific fiduciary duty alleged to be breached, the Court has refused to impose the obligation on the government." *Ramona Two Shields v. United States*, 820 F.3d 1324, 1332–33 (Fed. Cir. 2016).

Here, Plaintiffs allege that the Stigler Act imposed a duty on Defendant, first, to object to the fact that the attorney for Reagan Smith filed the petition (and amended petitions) initiating the lease approval proceeding on behalf of the Allotment's owners, without the consent of Plaintiffs, "despite an obvious conflict of interest" as legal counsel for the proposed oil and gas lessee and, second, to ensure payment of the negotiated bonus ($500/acre) to Leasing Plaintiffs. ECF No. 10 at 21–22; *see* ECF No. 6 ¶¶ 43, 48–49. Although the Stigler Act undisputedly imposes some limited trust duties on Interior Department attorneys related to their involvement in lease approval proceedings, *see* ECF No. 8 at 14–15, nothing in the Stigler Act imposes the obligations Plaintiffs allege. Thus, Plaintiffs fail to demonstrate the existence of a trust duty that Defendant breached.

Regarding the first alleged duty, Plaintiffs specifically take issue with the fact that the practice for initiating oil and gas lease approval proceedings under the Stigler Act usually involves an oil and gas company attorney filing a petition on behalf of the mineral owners, which presents a potential dual-representation problem. ECF No. 10 at 19–21; *see* ECF No. 6 ¶ 49. Acknowledging that the Stigler Act did not require the Trial Attorney to prepare and file the petition, ECF No. 10 at 21, Plaintiffs claim instead that "upon entering such a proceeding, [the Trial Attorney] should have objected in some manner to such an obviously unethical and potentially harmful process that is fraught with the danger of unfair dealing." *Id.* at 20. Plaintiffs

22

do not cite, nor is this Court aware of, any provision of the Stigler Act that would have required the Trial Attorney to object in such an instance.

Instead, Plaintiffs cite *Walker v. United States*, 663 F. Supp. 258 (E.D. Okla. 1987), a Federal Tort Claims Act case in which the federal district court found that an Interior Department attorney breached his fiduciary duties to represent the Indian landowner's interests in an oil and gas lease approval proceeding held pursuant to the Stigler Act. *Walker* identified the same dual-representation problem that Plaintiffs object to here and even went so far as to suggest regulatory reform in its opinion. *Id.* at 262 (noting that the "recognized and customary procedure for commencing approval hearings creates an inherent conflict of interest by the attorney's apparent dual representation"); *id.* at 263 (suggesting that "[i]t is the Department of Interior's responsibility to change this procedure"). Notwithstanding the court's criticism of the customary practice of initiating Stigler Act proceedings, it cited no statutory language requiring the Interior Department attorney to file the petition or object to a petition filed by an attorney retained by the adverse party. The statutory duties it found were violated related to the Government's complete failure to represent the best interests of the Indian landowner. *See id.* at 262 (finding that the Interior Department attorney relied on another private attorney, also employed by the oil and gas company, to represent the Indian landowner "rather than assume the duty himself"). For example, the court held that the Interior Department attorney failed to diligently represent the landowner at the hearing, obtain a current appraisal of the land, advise the landowner of current oil and gas production on the property, and recommend competitive bidding. *See id.* at 267.

Moreover, *Walker* is distinct from the case at hand because the court there found tort liability. Although it frequently discussed the Government's statutory duties, given that the Stigler Act provides for an Interior Department attorney to appear in lease approval proceedings, it did

23

not consider the Government's liability under a breach of trust claim using the relevant two-prong analysis of *Navajo I*. This is important because, unlike a duty of care sufficient to state a tort claim, only a fiduciary duty flowing from rights-creating or duty-imposing statutory or regulatory language can state a breach of trust claim. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011) ("The trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law . . . ."); *Hopi Tribe*, 782 F.3d at 667 ("[T]he United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation."). The *Walker* court viewed the Government's duty through the lens of an attorney-client relationship between the Interior Department attorney and Indian landowner "with all the attend[a]nt legally imposed obligations that a fiduciary relationship creates." 663 F. Supp. at 267. However, "[c]ommon law principles—which are often used to define the contours of a fiduciary relationship in other contexts—cannot serve such a purpose at th[e] [first] stage" of the *Navajo I* jurisdictional analysis. *Confederated Tribes & Bands of Yakama Nation v. United States*, 171 Fed. Cl. 692, 705 (2024) (citing *Jicarilla Apache Nation*, 564 U.S. at 185).

Looking at the statutory language of the Stigler Act, Defendant did not breach a "specific rights-creating or duty-imposing statutory or regulatory prescription[]" by not objecting to the Reagan Smith attorney's filing of the lease petition because the Stigler Act does not impose such a duty on Defendant. *Navajo I*, 537 U.S. at 506. Instead, as Plaintiffs admitted at oral argument, the Trial Attorney fulfilled her obligations under the Stigler Act. ECF No. 17 at 59:3–8 (expressing disappointment with "the system" and stating that the Trial Attorney "was doing exactly what she was told to do and what every federal attorney in the Department of the Interior does when they're assigned to one of these cases"); *see* ECF No. 14 at 8–9 (describing the Trial Attorney as "an individual federal attorney who was just following Defendant's policies and procedures").

24

Plaintiffs' disagreement with the procedures established by the Stigler Act—although they reflect the *Walker* court's frustration with those same procedures—cannot state the basis for a breach of trust claim under the Tucker Act. Without a specific statutory duty, there can be no breach. *Ramona Two Shields*, 820 F.3d at 1332–33.

Plaintiffs attempt to save their claim by arguing that they allege violations of Defendant's "broader duty to provide adequate legal representation in all aspects of the Stigler Act's lease-approval proceedings." ECF No. 10 at 22. Relying on the Stigler Act's predecessor, the Act of 1933, Plaintiffs argue that Interior Department attorneys have a "duty . . . to appear and represent any restricted member of the Five Civilized Tribes before the county courts of any county in the State of Oklahoma, or before any appellate court thereof, in any matter in which said restricted Indians may have an interest." *Id.* (quoting Act of 1933 § 8). As Defendant points out and Plaintiffs later concede, the provision of the Act of 1933 to which Plaintiffs cite was repealed by the Stigler Act. *See* ECF No. 11 at 11 (citing the Stigler Act § 12, which reads: "Sections 1 and 8 of the Act of January 27, 1933 (47 Stat. 777), are hereby repealed"); *see also* ECF No. 14 at 6 (acknowledging error in basing Plaintiffs' argument on a repealed provision of law).

Plaintiffs also rely on *Heckman v. United States*, 224 U.S. 413 (1912), to support their claim that Defendant has a broader trust duty to Plaintiffs than what is specifically outlined in the Stigler Act. *See* ECF No. 10 at 22–23. *Heckman*, however, is similarly inapplicable because it interpreted another predecessor of the Stigler Act, the Act of 1908. *See* 224 U.S. at 442–43 (discussing authority of the Secretary under the Act of 1908 § 6 to institute suits on behalf of Five Tribe allotees to cancel conveyances made in violation of the Act). It is true that the Act of 1908 specifically assigned the Secretary the "duty to counsel and advise all allottees [of the Five Civilized Tribes] . . . having restricted lands of their legal rights with reference to their restricted

25

lands, without charge, and to advise them in the preparation of all leases."  Act of 1908 § 6.  Since 1908, however, Congress has significantly cabined the duty of Interior Department attorneys representing the interests of Five Tribe allottees by eliminating the attorney's duty to counsel and advise.  *See Walker*, 663 F. Supp. at 268 ("The progression of Congressional enactments demonstrate an intent by Congress to restrict and narrow the duties of the government's attorney.").  It also transferred the authority that the Secretary once had to approve oil and gas leases on restricted allotments to the state court.  *Compare* Act of 1908 § 2 ("That leases of restricted lands for oil, gas or other mining purposes . . . may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise . . . .") *with* Act of 1933 § 8 ("[N]o conveyance of any interest in land of any full-blood Indian heir shall be valid unless approved in open [county] court . . . .").  Thus, any broader trust duty imposed under the Act of 1908 cannot form the basis for Plaintiffs' breach of trust claim under the narrower Stigler Act.  And Plaintiffs' invocation of a general trust relationship between the Government and Five Tribe allotees seeking to convey interests in restricted lands also cannot support their claim.  *See Arizona*, 599 U.S. at 572 (Thomas, J., concurring) (explaining that "tribes' legal claims against the Government must be based on specific provisions of positive law, not merely an amorphous 'trust relationship'").

Comparison to *United States v. Mitchell* is illustrative.  There, the United States Supreme Court found that federal statutes and regulations imposed fiduciary duties upon the United States as to tribal land that had been managed by the Interior Department for decades.  463 U.S. at 222.  In *Mitchell*, the Supreme Court ruled that the federal government owed a specific trust duty to the tribe because the government agency supervised and controlled the day-to-day process of harvesting tribal timber and the statute at issue, 25 U.S.C. § 162(a), authorized the Secretary of the

Interior "to invest tribal and individual Indian funds held in trust . . . if deemed advisable and for the best interest of the Indians." 463 U.S. at 222 n.24. Unlike here, where the Stigler Act imposes only limited duties on Defendant with respect to oil and gas leasing on restricted land, in *Mitchell* "[v]irtually every stage of the process [was] under federal control." *Id.* at 222. The scope of federal involvement in oil and gas leases subject to the Stigler Act is much narrower. The Act defined only a limited role for the Trial Attorney to represent Plaintiffs' interests in relation to the lease approval hearing, and it was the state court that determined the fairness of the leases before it. *See* Stigler Act § 1.

The second duty that Plaintiffs allege Defendant breached—a duty to "ensure payment"— is similarly absent from the Stigler Act. ECF No. 10 at 21–22; *see* ECF No. 6 ¶¶ 48–49. In their response brief, Plaintiffs clarify that their claim is not "that they were due any particular bonus payment," but rather that "they did not receive adequate legal representation, where the Trial Attorney communicated to at least some Indian owners that the bonus payment would be $500/acre, then failed to change any of the leases, amend the Petition, file a Proposed Order, or ask the judge for clarification in the final order to reflect a $500/acre bonus payment." ECF No. 10 at 26.

Like their allegation that the Trial Attorney should have objected to the Reagan Smith attorney's filing of the petition, Plaintiffs' allegation that the Trial Attorney had a duty to ensure that the $500 per acre bonus payment was incorporated into certain legal documents has no basis in the Stigler Act. The Stigler Act does not prescribe specific duties of Interior Department attorneys with respect to lease or payment terms; all it requires is that the Interior Department attorney be provided notice of and be present at the hearing. The relevant section of the Stigler Act reads:

27

> The grantor shall be present at said hearing and examined in open court before such conveyance shall be approved, unless the grantor and the probate attorney shall consent in writing that such hearing may be had and such conveyance approved in the absence of the grantor, and the court must be satisfied that the consideration has been paid in full.

Stigler Act § 1(b).  The Act also gives the Interior Department attorney the right to appeal a lease approval order but does not mandate that the attorney do so.  Stigler Act § 1(e).  As Defendant points out, the statute does not create the duties that Plaintiffs allege the Trial Attorney breached.  *See* ECF No. 8 at 32.  A duty to ensure that the lease, petition, or approval order reflects the final negotiated bonus payment does not appear in the Act.[10]  Without pointing to any "specific rights-creating or duty-imposing statutory or regulatory prescriptions" regarding these claims, the Court cannot find a breach of trust.  *United States v. Navajo Nation (Navajo II)*, 556 U.S. 287, 301 (2009).

Rather, the only provision of the Stigler Act that speaks to payment specifies that "the court," not the Interior Department attorney, "must be satisfied that the consideration has been paid in full."  Stigler Act § 1(b).  Thus, the statute can be read as creating a duty for the state court to ensure that Reagan Smith rendered the negotiated payment to Leasing Plaintiffs.  The Amended Complaint's allegations seem to be directed only against the actions of the Trial Attorney rather than the state court judge, but at oral argument Plaintiffs suggested that the state court should be considered a federal actor and that it breached its duties under the Stigler Act.  *See* ECF No. 17 at 54:24–55:5 (asserting that the state court judge was "working as a federal representative because Congress, in the Stigler Act, assigned these judges the duty to perform a federal function").  To be sure, Plaintiffs are not permitted to amend their complaint through new allegations raised in

---

[10] This absence of duty is evinced by Plaintiffs' own reasoning: that "nothing in the federal statutes or state court procedures would have prevented the U.S. Trial Attorney from filing an amended petition."  ECF No. 14 at 12.  The Court agrees; the Trial Attorney was not prohibited from doing more to advance the interests of Plaintiffs.  However, a lack of prohibition is not an affirmative duty.

connection with their response to Defendant's motion to dismiss. *See Davis v. United States*, 108 Fed. Cl. 331, 337 n.4 (2012) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

But even assuming that Count I can be read as alleging a breach of duty by the state court judge rather than the Trial Attorney, Plaintiffs' allegation fails to state a plausible claim for relief. The transcript of the lease approval hearing reflects that the Trial Attorney informed the court of Reagan Smith's agreement to increase the bonus payment to $500 per acre, and the checks written to each of the Leasing Plaintiffs were read into the record. ECF No. 8-4 at 6–8. Proof of Delivery, certifying proof of payment to all absent Leasing Plaintiffs, was filed after the conclusion of the hearing. *See* ECF No. 6 ¶¶ 37–38. The 2022 Order reflects the court's approval of the leases, which stated consideration of $200 per acre and a 3/16th royalty, and documents that during the lease approval proceeding Reagan Smith bid the highest and best offer of $502 per acre, including delayed rental. ECF No. 8-5 at 20. Thus, as to Leasing Plaintiffs, the allegations and documents incorporated by reference in the Amended Complaint, as well as other public court documents, plainly demonstrate the state court's satisfaction that the bonus payments "ha[d] been paid in full." Stigler Act § 1(b). The Stigler Act did not require anything more of the state court. *Id.* Because the Stigler Act did not mandate further affirmative steps by the state court with regard to lease bonus payments, assuming arguendo that the Amended Complaint contains such allegations, Plaintiffs fail to state a plausible claim that the court breached a statutory trust duty.[11]

---

[11] Plaintiffs take issue with whether the checks reflected the $500-per-acre bonus payment amount. *See* ECF No. 10 at 26–27; ECF No. 11 at 16. As they point out, using the $502 figure documented in the 2022 Order, the amounts of some checks read into the approval hearing record *exceed* what would be due to Leasing Plaintiffs. But Defendant can hardly be said to have plausibly breached its duty to ensure payment in full if Plaintiffs were paid amounts at or in excess of the negotiated bonus payment.

Plaintiffs' Amended Complaint does not identify any statutory duties that Defendant failed to perform.  Accordingly, the Court lacks jurisdiction over Count I because it fails under prong one of the breach of trust analysis.

> 2.     Count II Does Not Identify Statutory Duties that Could Form the Basis for Plaintiffs' Claim.

Plaintiffs' second count alleges that Defendant breached trust duties owed to Plaintiffs by failing to ensure proper and timely oil and gas lease payments to all mineral owners of the Allotment, including Non-Leasing Plaintiffs.  The alleged duties in Count II can be separated into two general categories: (1) a duty to ensure the lease justly compensated Non-Leasing Plaintiffs, ECF No. 6 ¶¶ 52, 54; and (2) a duty to collect rent and royalty payments and deposit such payments into IIM accounts, *id.* ¶ 56.[12]  Like Count I, Count II also fails under the first prong of the breach of trust test because Plaintiffs allege that Defendant breached duties under the Stigler Act that are not enumerated in the statute.

The first category of Count II claims—which rest on an alleged duty to ensure lease payments to Non-Leasing Plaintiffs—has no basis in the Stigler Act.  According to Plaintiffs, because only 20 out of 84 of the Allotment's mineral owners signed leases with Reagan Smith, the Trial Attorney failed to fulfill her trust duty by not ensuring provision of lease payments to Non-Leasing Plaintiffs.  *See* ECF No. 10 at 28.  Plaintiffs, however, point to no specific trust duty in the Stigler Act requiring Defendant to ensure compensation for Non-Leasing Plaintiffs.  Nor can the Act reasonably be read to impose such duty.

---

[12] Count II of Plaintiffs' Amended Complaint also alleges that Defendant had a duty to object to or disapprove of leases that lacked the consent of all mineral owners.  *See* ECF No. 6 ¶¶ 51–56.  Plaintiffs clarified in their response brief that their breach of trust claim is not based on those allegations. *See* ECF No. 10 at 21 ("Nor do Plaintiffs claim that it was [a] breach of trust to not have obtained the consent of all mineral interest owners . . . ."); *id.* at 28 ("Plaintiffs do not claim, as Defendant states, that the United States has a duty to 'disapprove leases that lack the consent of every fractional owner.'").

Section 1 of the Stigler Act requires state court approval of a conveyance, including an oil and gas lease, of any interest in a restricted allotment of a member of the Five Civilized Tribes. Thus, the parties to the conveyance are the relevant parties in the approval proceeding. This conclusion is further borne out by the procedures set forth in the Act, which require the "grantor" (*i.e.*, the mineral owner seeking to transfer his interest) to be present at the lease approval hearing or to consent to the hearing occurring in his absence. *See* Stigler Act § 1. Section 1 also specifically refers to the "grantee" (*i.e.*, the party seeking to receive the mineral owner's interest), whose obligation it is to bear the fees and costs of the approval proceeding. *See id.* Notably, the Act includes no provisions addressing mineral owners of the subject allotment who are not "grantors." This language indicates that the duties of the Trial Attorney attendant to the lease approval proceeding apply only to mineral owners who are seeking approval to enter into the oil and gas leases at issue. The Act cannot be read to impose any duties on the Trial Attorney related to mineral owners who, like Non-Leasing Plaintiffs, did not enter into leases with the oil and gas company.

Plaintiffs' reliance on Section 4 of the Stigler Act is also misplaced. *See* ECF No. 14 at 6–8. Section 4 states that Interior Department attorneys "are authorized to appear and represent any restricted member of the Five Civilized Tribes in Oklahoma before any of the courts of the State of Oklahoma in any matter in which the said restricted Indian may have an interest." Stigler Act § 4. Plaintiffs maintain that because the term "any restricted member" in Section 4 is broader than the term "grantors" in Section 1 of the Act, the Trial Attorney had a duty to represent and protect the interests of Non-Leasing Plaintiffs in the lease approval proceeding. *See* ECF No. 14 at 9. There are two problems with this line of reasoning. First, Section 1 of the Stigler Act specifically controls the lease approval proceeding at issue here, and thus its language identifying "grantors"

as the individuals in the proceeding qualifies the Trial Attorney's specific duties with respect to that proceeding.[13]  Second, Section 4 of the Stigler Act did not impose any additional duties on the Trial Attorney, as it states only that Interior Department attorneys "are *authorized*" to appear and represent any restricted member, not that they are *obligated* to do so.  Stigler Act § 4 (emphasis added).  Nor does the language specify any specific duties imposed on the attorney in the event the Government chooses to exercise that authority.  Section 4's general, permissive language cannot be the basis for the trust duties alleged by Plaintiffs.  *See Arizona*, 599 U.S. at 563–64 ("The Federal Government owes judicially enforceable duties to a tribe only to the extent it expressly accepts those responsibilities.") (internal quotation marks omitted).

In addition to their Section 4 argument, Plaintiffs again make the argument that Defendant owes a broader, general trust obligation to the owners of restricted fee allotments of the Five Civilized Tribes.  *See* ECF No. 10 at 29.  They argue that the Trial Attorney breached this duty because she failed to act in the "best interests" of Non-Leasing Plaintiffs.[14]  ECF No. 17 at 48:13–

---

[13] Plaintiffs' argument that the word "grantors" should be interpreted as "potential grantors" is unavailing.  ECF No. 14 at 9–11.  Read as a whole, the statute indicates that the Trial Attorney appeared at the hearing to protect the best interests of only those allotment owners who signed leases.  The use of "any restricted member" in Section 4 contrasts with "grantor" in Section 1, suggesting that the different sections of the statute refer to different groups—the latter being more inclusive than the former.  *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings." (quoting A. Scalia & B. Garner, Reading Law 170–71 (2012)).  Indeed, Congress would likely have used the term "potential grantors," or possibly a term as broad as "any restricted member," had it intended Section 1 to encompass all potential lessors with interests in the allotment subject to the lease.  *Id.*

[14] Much of Plaintiffs' argument on this point is normative.  *See* ECF No. 10 at 30 ("It would have been relatively easy to protect all of the Indian owners."); *id.* at 31 (describing legislation that applies to the Fort Berthold Indian Reservation and suggesting that "[a] similar scheme could have been implemented in this case to provide that every owner, whether or not they consented, would receive a distribution"); *id.* at 24 (suggesting that the Trial Attorney "could have asked the state court judge . . . to include in his Order a production-based provision for all non-leasing owners").  Such policy concerns are better addressed to Congress and the Interior Department.  For the

18. As noted above, Plaintiffs' argument ignores the fact that the trust duty of the United States toward restricted fee allotment owners of the Five Civilized Tribes has narrowed since the initial policy of allotment. As they acknowledge, the main legal authority underlying Plaintiffs' assertion of this broad duty—*Heckman*—"pre-dates the Stigler Act of 1947." ECF No. 10 at 29. Interpreting the Act of 1908, *Heckman* defined the United States' duty to restricted fee allotment owners as "safeguarding the individual ownership of allottees through suitable restrictions which were designed to secure them in their possession and to prevent their exploitation." 224 U.S. at 432–33. With the passage of the Act of 1933 and then the Stigler Act, that duty has narrowed. *See Walker*, 663 F. Supp. at 267–68; *see also* Act of 1933 § 8 (transferring authority to approve oil and gas leases from the Secretary to the state courts). Thus, instead of demonstrating that the United States presently has a broad trust duty toward restricted fee allotment owners, Plaintiffs' invocation of *Heckman* only serves to highlight that the trust duty was much broader in 1912 (the year of the *Heckman* decision) than it is today. *Cf. Jicarilla Apache Nation*, 564 U.S. at 176 (acknowledging that over time Congress has "defined and redefined the [general] trust relationship" between the Government and the Indian people through a series of new and amended statutes). Plaintiffs also rely on *Choctaw Nation v. United States*, 121 F. Supp. 206 (Ct. Cl. 1954), to suggest that Defendant has a broad duty to act in the best interest of allotment owners. *See* ECF No. 10 at 29–30. This case similarly fails to persuade because it simply described the purpose of the original Choctaw allotment agreement; it did not comment on the limited duties described in the Stigler Act. *Choctaw Nation*, 121 F. Supp. at 208–09.

---

Court's purposes, they are irrelevant to the analysis of whether Defendant breached specific duties defined in the relevant statute. *See Navajo II*, 556 U.S. at 302 (plaintiffs must "identify a specific, applicable, trust-creating statute or regulation that the Government violated").

In any event, even if the trust obligation was as broad as Plaintiffs suggest, a statute stating a "general trust relationship" between the United States and Indian tribes is not sufficient to support a breach of trust claim. *Jicarilla Apache Nation*, 564 U.S. at 176; *see id.* at 178. The Court cannot impose a specific trust duty on the Government unless the duty is established in the relevant statute, *Ramona Two Shields*, 820 F.3d at 1332–33, and here, the Stigler Act does not include a specific duty to ensure lease payments to Non-Leasing Plaintiffs. Because the Court cannot infer trust duties not found in the text of a treaty, statute, or regulation, Plaintiffs' claim must fail.

The second category of Plaintiffs' Count II claims fares no better. In category two, Plaintiffs claim that Defendant breached its trust duties because it did not manage the lease monies paid to Leasing Plaintiffs by collecting and depositing payments into IIM accounts. ECF No. 6 ¶ 56. To understand how the payments were to be made under the leases in question here, the Court looks to the language of the 2022 Order approving the leases. The 2022 Order states:

> This Court hereby finds that the bonus payment checks to the restricted Indian mineral owners in this cause of action constitute monies directly derived from the use of restricted fee lands that are paid directly to the Secretary on behalf of the account holder as contemplated by 25 C.F.R. 115.702. Further, this court having been advised that certain of the restricted Indian mineral owners may wish to have their bonus payment checks deposited in their 25 C.F.R. 115.701 Individual Indian Money Accounts, pursuant to 25 C.F.R. 115.702 the Secretary of the Interior is hereby ordered to accept for deposit those bonus payment checks so designated on the face thereof.

ECF No. 8-5 at 20–21. The 2022 Order directs the Secretary to accept the bonus payment checks only insofar as "certain of the restricted Indian mineral owners may wish to have their bonus payment checks deposited in their 25 C.F.R. [§] 115.702 Individual Indian Money Accounts." *Id.* Thus, the Order contemplated that some individuals may prefer to have the Secretary safeguard their bonus payments—if "those bonus payment checks [were] so designated on the face thereof"—but did not require all the bonus payments be deposited into IIM accounts. *Id.* Plaintiffs

34

do not allege that any of the bonus payment checks were designated for deposit into the Leasing Plaintiffs' IIM accounts. According to the transcript from the 2022 lease approval proceeding, the Reagan Smith attorney read the checks for each Leasing Plaintiff into the record, all of which were payable to the individual plaintiffs, not the Secretary. *See* ECF No. 8-4 at 7–8.

The procedure outlined in the 2022 Order reflects what Defendant correctly argues: that Defendant had no duty to affirmatively and unilaterally establish IIM accounts for every mineral owner and deposit the lease payments therein. *See* ECF No. 8 at 32–33 ("the restricted Indian mineral owners *may wish* to have their bonus payment checks deposited into their . . . [IIM] Accounts") (emphasis added)). The regulation referenced in the Order requires the Bureau of Indian Affairs ("BIA") to accept certain specific sources of money on behalf of tribes or tribal members, but the bonus payments here do not fall into those categories. *See* 25 C.F.R. § 115.702 (2001).[15] Thus, although the Order permits mineral owners to have their bonus payments deposited in IIM accounts, it does not require them (or the Secretary) to do so. Furthermore, there is no duty in the Stigler Act requiring the Government to collect and deposit grantors' lease payments into IIM accounts. The only duty relating to payments that appears in the Stigler Act is the requirement that the court presiding over the conveyance approval proceeding "must be satisfied that consideration has been paid in full." Stigler Act § 1(b). The Stigler Act does not

---

[15] This regulatory provision mandates that the BIA accept "[f]unds derived directly from trust lands, restricted fee lands, or trust resources that are presented to the Secretary, on behalf of the tribe or individual Indian owner(s) as required by contract (i.e., direct pay) and returned by mail to the payor as undeliverable." This language indicates that the funds that the BIA must accept for deposit into a trust account include lease payments related to a restricted allotment that the payor (here, the lessee) tried to pay the individual Indian landowner but could not because the payment was returned as undeliverable. Plaintiffs have not alleged that Defendant failed to accept payments that were sent to Plaintiffs but returned as undeliverable. Therefore, as a matter of law, the funds at issue here are not a source of money that the BIA is statutorily required to accept on behalf of Plaintiffs.

35

specify that any particular payment method must be used, nor that payment must be made to the Secretary rather than the grantor.  Thus, because Defendant did not "expressly accept[]," *Jicarilla Apache Nation*, 564 U.S. at 177, the obligation to collect and deposit oil and gas bonus payments or royalties into IIM accounts for Leasing Plaintiffs, there is no specific trust duty to enforce and thus no jurisdiction over Count II.

3.    FOGRMA Does Not Apply.

Count III mirrors the second category of Count II claims but relies on a different statute. Count III alleges that Defendant failed to fulfill its purported duties to collect lease payments for Plaintiffs, establish IIM accounts for all eligible Plaintiffs, and manage such IIM accounts.  ECF No. 6 ¶¶ 57–59.  Plaintiffs base these allegations on the federal government's duties to Indian landowners under FOGRMA.  *Id.* ¶ 59.  FOGRMA is a federal statute aimed at improving the Secretary's oversight of oil and gas production on federal and Indian land subject to federal mineral leasing laws.  *See* 30 U.S.C. § 1701(a).  The stated purposes of FOGRMA are: (1) clarifying the responsibilities and obligations of lessees, operators, and other persons involved in the transportation or sale of oil and gas from the federal and Indian lands and the Outer Continental Shelf; (2) clarifying the responsibilities of the Secretary to maintain a royalty management system for such leases; (3) requiring enforcement of disbursement of oil and gas revenues; (4) fulfilling the United States' trust responsibility; and (5) developing an efficient federal royalty management system.  *Id.* § 1701(b).

Plaintiffs assert that Defendant had a duty under FOGRMA to establish IIM accounts for all Plaintiffs—both Leasing and Non-Leasing.  *See* ECF No. 6 ¶¶ 56–59.  Accordingly, Plaintiffs take issue with the fact that Defendant permitted "payments to be made directly to the restricted Indian landowners."  *Id.* ¶ 59.  Instead, Plaintiffs allege, Defendant should have ensured that Reagan Smith "sen[t] all associated payments to the MMS [Minerals Management Service] to be

36

deposited into IIM accounts and managed there for Plaintiffs' benefit." *Id.* Plaintiffs allege that "[s]ince at least 1982, royalty, rent and bonus payments, and accompanying reports, should have been made to the [MMS] at the Department of the Interior, which is charged with the responsibility under [FOGRMA] . . . for accounting for payments on Indian lands." *Id.* Acknowledging the Court's statute of limitations under 28 U.S.C. § 2501, Count III's breach of trust claim is limited to Defendant's failure to carry out these purported duties during the six years preceding the Complaint. *Id.* ¶ 58.

The fatal flaw with Plaintiffs' Count III allegations is that FOGRMA does not apply to Stigler Act leases. And because FOGRMA does not apply, Defendant had no duty to unilaterally create IIM accounts for all Plaintiffs. Reasoning that because FOGRMA applies only to leases approved by the United States "under a mineral leasing law" that is "administered by the Secretary," Defendant contends that FOGRMA is inapplicable to Stigler Act leases because the Stigler Act is not administered by the Secretary. *See* ECF No. 11 at 41 (citing 30 U.S.C. §§ 1712(a), 1702(5), 1702(8)). Thus, "any of the duties found in [FOGRMA] do not apply." *Id.* at 20. The Court agrees.

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980). FOGRMA defines a "lease" as "any contract . . . approved by the United States under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas." 30 U.S.C. § 1702(5). FOGRMA defines "mineral leasing law" as "any Federal law administered by the Secretary authorizing the disposition under lease of oil or gas." *Id.* § 1702(8).

The Stigler Act is not a federal law "administered by the Secretary." Rather, in relevant part, the Stigler Act governs conveyances of any interest in certain restricted Indian allotments in

Oklahoma and mandates state court approval of such conveyances pursuant to an approval procedure. *See* Stigler Act § 1(a). Conveyances subject to the Stigler Act can include oil and gas or mineral leases, but the statute is not directed solely at such leases. *See id.* (applying to all conveyances "of any interest" in restricted land). And although the Interior Department has a role in the approval process, only the state court (not the Secretary) is authorized to approve the conveyances at issue. *See id.* Because the Stigler Act by its terms is not "administered by the Secretary," it is not a "mineral leasing law" subject to the requirements of FOGRMA.

The Indian Long-Term Leasing Act ("ILTLA"), 25 U.S.C. § 396, which is a "mineral leasing law" subject to FOGRMA, is a useful comparison to demonstrate that the Stigler Act, by its plain terms, is not a law to which FOGRMA applies. Unlike the Stigler Act, the ILTLA governs most oil and gas development on Indian allotments and specifically authorizes "[a]ll lands allotted to Indians in severalty" to "be leased [by the allottee] for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior." 25 U.S.C. § 396; *see Birdbear*, 178 Fed. Cl. at 93 (citing *Birdbear v. United States*, 162 Fed. Cl. 225, 234 (2022)) (summarizing statutory and regulatory framework applicable to oil and gas leasing under ILTLA). Unlike the Stigler Act, the ILTLA authorizes the Secretary "to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect." 25 U.S.C. § 396. Confirming what is clear from the language of the ILTLA, the Secretary's implementing regulation acknowledges that FOGRMA applies to leases approved under the Act. *See* 25 C.F.R. § 212.6 (1996) ("The functions of MMS for reporting, accounting, and auditing are found in 30 CFR chapter II, subchapters A and C, which apply to leases approved under this part."). Notably, the ILTLA *specifically excludes* allotments of the Five Civilized Tribes. 25 U.S.C. § 396.

Prior unsuccessful legislative reform further supports the conclusion that FOGRMA does not apply to leases subject to the Stigler Act. As Defendant points out, a proposed bill introduced in the House of Representatives in 2001, known as the Five Nations Indian Law Reform Act, sought to eliminate state court approval of Stigler Act leases and instead give the Secretary "exclusive jurisdiction to approve conveyances and leases of restricted property." ECF No. 8 at 43 (quoting Five Nations Indian Law Reform Act, H.R. 2880, 107th Cong. § 201 (2001)). Once approved, the bill would have required the Secretary to "exercise all the duties and responsibilities of the Secretary under [FOGRMA]." H.R. 2880, 107th Cong. § 207(b). If the Stigler Act could be interpreted as "a mineral leasing law," there would have been no reason to amend the Act to expressly apply the requirements of FOGRMA. The fact that H.R. 2880 sought to transfer from the state court to the Secretary the authority to approve conveyances of restricted Indian lands and to require the Secretary to fulfill his duties under FOGRMA suggests that the Secretary does not "administer" the Stigler Act under the current statutory framework.

Plaintiffs attempt to rely on other sections of the Stigler Act to demonstrate that the Act is "administered by the Secretary," in particular Sections 5 and 11. *See* ECF No. 10 at 38. Section 5 reads:

> That all funds and securities now held by, or which may hereafter come under the supervision of the Secretary of the Interior, belonging to and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unenrolled, are hereby declared to be restricted and shall remain subject to the jurisdiction of said Secretary until otherwise provided by Congress, subject to expenditure in the meantime for the use and benefit of the individual Indians to whom such funds and securities belong, under such rules and regulations as said Secretary may prescribe.

Stigler Act § 5. Section 11 of the Stigler Act states that "no order of the Corporation Commission affecting restricted Indian land shall be valid as to such land until submitted to and approved by the Secretary of the Interior or his duly authorized representative." *Id.* § 11.

39

As Defendant correctly argues, *see* ECF No. 11 at 21, Section 5 applies generally to restricted "funds and securities" of the Five Civilized Tribes; it does not specifically address income derived from oil and gas leases on restricted allotments.  Stigler Act § 5.  Nor does it require the Secretary to collect and manage payments related to such leases on behalf of allotees.  Rather, it simply retains the Secretary's jurisdiction over restricted funds and securities that were already in the Secretary's possession "or which may hereafter come under the supervision of the Secretary."  *Id.*  Section 11, on the other hand, merely requires Secretary approval before orders of the Oklahoma Corporation Commission become valid as to restricted allotments subject to the Act.  Plaintiffs fail to explain how and when commission orders affect oil and gas leases on restricted allotments.  The Court, however, sees nothing in Sections 5 or 11 of the Stigler Act to suggest that any involvement by the Secretary equates to administration of the Act or that the Secretary approves, manages, or oversees oil and gas leases subject to the Stigler Act.

Because FOGRMA is inapplicable to Stigler Act leases, Plaintiffs' claim that Defendant breached its FOGRMA duties in connection with the leases in question here fails under prong one of *Navajo I*.  This count must likewise be dismissed for lack of jurisdiction.

### C.    Plaintiffs Fail to Allege a Cognizable Fifth Amendment Taking.

The remaining claims are asserted by only Non-Leasing Plaintiffs.  They allege that Defendant effectuated a taking of their property interests because the 2022 Order approving the leases at issue did not require Reagan Smith to make any payments to Non-Leasing Plaintiffs.  ECF No. 6  ¶ 65; *see id.* ¶¶ 60–67.  As Defendant correctly argues, this allegation fails to plausibly state a viable takings claim.

The Takings Clause of the Fifth Amendment guarantees that the federal government will not take private property "for public use, without just compensation."  U.S. Const. amend. V, cl. 4.  In deciding a takings claim, the Court must first determine "whether the claimant has identified

40

a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking."

*Acceptance Ins. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). Once it determines that the claimant possesses a valid property interest, the Court can turn to the question of "whether that property interest was taken." *Id.*

Here, Non-Leasing Plaintiffs who have alleged a present ownership interest in the Allotment have stated a cognizable Fifth Amendment property interest. As Plaintiffs observe, the relevant property interest that was allegedly taken is Non-Leasing Plaintiffs' right to recover income from an oil and gas lease based on their fractional interest in the Allotment.[16] *See* ECF No. 10 at 42; *see also United States v. Craft*, 536 U.S. 274, 280 (2002) (recognizing that "[t]enants in common have . . . the right to use the property, to exclude third parties from it, and to receive a portion of any income produced from it"). Non-Leasing Plaintiffs could have entered into a lease with Reagan Smith, so it logically follows that Non-Leasing Plaintiffs have a right to receive income from a similar lease arrangement.[17] Thus, Non-Leasing Plaintiffs' allegations satisfy the first prong of the takings test. *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003) ("[T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment.").

---

[16] Defendant initially contended that the relevant property right was Non-Leasing Plaintiffs' right to exclude Leasing Plaintiffs from leasing the property to Reagan Smith. *See* ECF No. 8 at 36. After Plaintiffs clarified the property interest allegedly taken, Defendant conceded that the right to receive lease income could be the relevant property interest for the purpose of the takings analysis here, but that even so, there was no evidence of Defendant's interference with that property right. *See* ECF No. 17 at 35:22–36:8.

[17] Defendant acknowledged as much at oral argument. *See* ECF No. 17 at 30:15–31:23 (indicating that Non-Leasing Plaintiffs have a right to receive a portion of the income generated by their undivided fractional interest in the Allotment).

The Court next turns to the second prong: whether Non-Leasing Plaintiffs' property interest was taken. *Acceptance Ins.*, 583 F.3d at 854. It is at this step that Plaintiffs' theory falters because Defendant did not affirmatively take anything from Non-Leasing Plaintiffs and any inaction on the part of Defendant cannot be the basis for a takings claim. Indeed, Non-Leasing Plaintiffs maintain their relevant property interests in the Allotment and have available state court remedies to address the alleged harm.

First, Plaintiffs' takings claim cannot succeed because Defendant did not take Non-Leasing Plaintiffs' property interest in the Allotment. As Defendant points out, Oklahoma common law holds that owners of undivided partial interests in oil and gas, like Plaintiffs, are tenants in common. *Anderson v. Dyco Petroleum Corp.*, 782 P.2d 1367, 1371 (Okla. 1989); *Mood v. Wagner*, 23 P.2d 633, 635 (Okla. 1933); *see* ECF No. 6 ¶ 65 (referring to Non-Leasing Plaintiffs as having "owned an undivided, partial interest in the natural gas and other mineral resources" of the Allotment). "As cotenants each is entitled to market production from the [common property] and the sale of gas to a purchaser by one or more cotenants without consent of other cotenants is lawful." *Dyco Petroleum*, 782 P.2d at 1371; *see Wagner*, 23 P.2d at 635 (holding that "each tenant in common had the right to execute a separate lease which is effective as to his portion of the common property"); *see also Wolfe v. Stanford*, 64 P.2d 335, 339 (Okla. 1937) (recognizing that mineral conveyance by cotenant did not affect partition rights of non-consenting interest owner). In short, under Oklahoma law, Non-Leasing Plaintiffs did not have a right to be made part of the leases between Reagan Smith and Leasing Plaintiffs, and those leases did not impinge on the undivided fractional property interests of Non-Leasing Plaintiffs.

Moreover, Oklahoma law provides Non-Leasing Plaintiffs an available remedy. It recognizes that cotenants who lease their oil and gas interests "must account to a non-producing

42

cotenant for the market value of the production less any reasonable and necessary expenses of developing, extracting and marketing." *Dyco Petroleum*, 782 P.2d at 1373 (describing other equitable remedies utilized by the industry and courts); *see Harrell v. Samson Res. Co.*, 980 P.2d 99, 105–07 (Okla. 1998) (same). Here, Plaintiffs allege that neither Reagan Smith nor Leasing Plaintiffs have made payments to Non-Leasing Plaintiffs, or to Defendant on Non-Leasing Plaintiffs' behalf, for their mineral interests. ECF No. 6 ¶ 66. But to the extent that Reagan Smith or Leasing Plaintiffs did not abide by the relevant state law obligations, Non-Leasing Plaintiffs have the right to pursue a remedy in Oklahoma state court. *See* ECF No. 17 at 49:23–50:11 (admitting that "maybe they [Non-Leasing Plaintiffs] do" have an action in state court against Reagan Smith). The actions or inactions of Reagan Smith or Leasing Plaintiffs, however, do not give rise to a takings claim against Defendant.[18] *See All. of Descendants of Tx. Land Grants v. United States*, 37 F.3d 1748, 1482 (1994) (holding that an action by a third party "is not a specific taking action of the United States" and "create[s] no liability for the United States").

---

[18] Courts have recognized Fifth Amendment takings liability for the actions of third parties but only where the "third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014). To be considered the Government's agent, the third party must be acting on behalf of the Government. *See Hendler v. United States*, 952 F.2d 1364, 1378–79 (Fed. Cir. 1991) (finding an agency relationship where state officials had been authorized by the federal government to carry out environmental tests on the plaintiffs' land). For the Government's influence over the third party to be coercive, it must exhibit qualities of "irresistible pressure," *Turney v. United States*, 126 Ct. Cl. 202, 207–08 (1953), *aff'd*, 115 F. Supp. 457 (1953), rather than mere "friendly persuasion," *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985). Plaintiffs do not allege that Reagan Smith was acting as an agent for or under the coercive influence of Defendant when it entered into the subject leases, and courts have found that mere governmental approval or authorization of third-party actions is insufficient to state a basis for takings liability. *See, e.g.*, *Berry v. United States*, 159 Fed. Cl. 844, 849 (2022), *aff'd*, No. 2022-2031, 2024 WL 852819 (Fed. Cir. Feb. 29, 2024); *L & W Constr. LLC v. United States*, 148 Fed. Cl. 417, 422–23 (2020).

Plaintiffs do not dispute Defendant's reading of binding Oklahoma case law but instead contend that the existence of a state law remedy does not preclude them from bringing a Fifth Amendment taking claim in this Court. *See* ECF No. 10 at 44 (citing *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 190 (2019)). The Court agrees with that general statement of the law. Unlike in *Knick*, however, the state law remedies in Oklahoma are not merely alternate procedures for seeking compensation for an alleged taking by the government. *See* 588 U.S. at 187 (identifying the question presented as whether the plaintiff had to seek compensation through a state court inverse condemnation claim before proceeding to federal court on a constitutional taking claim under 42 U.S.C. § 1983). The Court must look to Oklahoma law in the instant matter to determine whether Plaintiffs have plausibly alleged a Fifth Amendment taking at all—*i.e.*, whether Plaintiffs have a cognizable property right and, if so, whether it was taken. *See Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016) (holding that the existence of an alternative remedy was "highly relevant to the takings analysis" in that case). Where the state law does not support the allegation that Defendant took Non-Leasing Plaintiffs' property interest, and Plaintiffs retain the "full range of remedies associated with any [] property right they possessed," they fail to allege a cognizable Fifth Amendment takings claim. *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002) (finding that because "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed[,]" the government action "did not constitute a taking of the contract").

Second, contrary to Plaintiffs' argument, the 2022 Order by its plain terms merely permitted Leasing Plaintiffs and Reagan Smith to enter into the leases; it did nothing to "prevent[]" Non-Leasing Plaintiffs from also leasing their interest in the Allotment or sharing in any income received by Leasing Plaintiffs. ECF No. 10 at 43; *see* ECF No. 8-5 at 20–21. The 2022 Order was

completely silent on the rights of Non-Leasing Plaintiffs precisely because they were not parties to the leases at issue in the lease approval proceeding.  Indeed, Plaintiffs do not allege that the state court's approval of the leases prohibited Non-Leasing Plaintiffs from executing additional leases with Reagan Smith or recovering from Reagan Smith or their cotenants for any compensation due. *See* ECF No. 8-4 at 6 (statement of Reagan Smith attorney at the approval proceeding indicating that the lessee would file new leases for approval with the court if leases with additional allotment owners arose in the future).  As a result, Non-Leasing Plaintiffs do not plausibly allege the loss of any property right in the Allotment due to the 2022 Order.  *See Castle*, 301 F.3d at 1342.

Even accepting as true that the 2022 Order prevented Non-Leasing Plaintiffs from receiving a share of the royalty income by failing to require Reagan Smith to make payments to them, such allegation does not state a cognizable takings claim because it is grounded on Defendant's alleged inaction or failure to act.  Plaintiffs seem to argue that either the state court judge and/or the Trial Attorney should have ensured that a certain quantum of mineral interest owners were included in the leases and that the 2022 Order provided compensation to Non-Leasing Plaintiffs.  *See* ECF No. 17 at 61:3–13 (asserting that the Trial Attorney should have found "at least half" but preferably "all[] of the owners" and ensured that they entered into leases); *see also* ECF No. 6 ¶¶ 2, 52, 54, 65.  The problem with this argument—beyond the fact that there is no requirement under Oklahoma law that a certain number of cotenants enter into an oil and gas lease, a point Plaintiffs concede, *see* ECF No. 10 at 42—is that "takings liability does not arise from government inaction or failure to act."  *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1361 (Fed. Cir. 2018).  Rather, the Government must affirmatively act to take a claimant's property rights.  *Id.* at 1362; *see also L & W Constr. LLC v. United States*, 148 Fed. Cl. 417, 422 (2020). Plaintiffs allege no such affirmative action here.

45

### D.    Plaintiffs' Alternative Illegal Exaction Claim Also Fails.

Finally, Plaintiffs alternatively argue that Defendant's actions constituted an illegal exaction of Non-Leasing Plaintiffs' property.  ECF No. 6 ¶¶ 68–70.  Defendant counters that Non-Leasing Plaintiffs cannot state a viable illegal exaction claim because they fail to allege any of the essential elements of such a claim.  *See* ECF No. 8 at 46–47.  Under the Federal Circuit's precedent, illegal exaction claims must plausibly allege that: (1) money or its effect has either been taken by or given to the Government; and (2) in obtaining these funds, the Government violated a statutory, regulatory, or constitutional provision.  *See id.* (citing *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020)).  The Court agrees with Defendant that Plaintiffs' allegations fail to satisfy both prongs of the illegal exaction test.

First, illegal exaction claims typically allege that "*money* . . . was 'improperly paid, exacted, or taken from the claimant.'"  *Mod. Sportsman, LLC v. United States*, 176 Fed. Cl. 567, 573 (2025) (emphasis in original) (quoting *Eastport S.S. Corp. v. United States*, 372 F.3d 1002, 1007 (Ct. Cl. 1967)).  "The phrase 'in effect' . . . simply refers to cases where the government *gained* money even though the money did not flow *directly* from the plaintiff to the government."  *Id.* at 574 (emphases in original).  Although at least one court has recognized that the exaction of property may state an illegal exaction claim, it did so where the Government proceeded to sell the exacted property.  *See Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996).  In *Modern Sportsman*, the court emphasized the importance of the fact that the Government allegedly gained money in *Bowman* through sale proceeds.  176 Fed. Cl. at 574.  Although the seizure of personal and real property in *Bowman* did not constitute a payment to the Government, money was exacted from the plaintiff "in effect" because the Government "*received money in return*" due to the sale.  *Id.* (emphases in original) (citing *Bowman*, 35 Fed. Cl. at 401).  Absent similar allegations that the Government gained money through sale proceeds, *Modern Sportsman* found no viable illegal

46

exaction claim was stated where a new federal rule required the plaintiffs to either destroy or surrender to the Government certain personal property. *Id.*

Here, Plaintiffs fail to allege that they paid any money directly to Defendant. Rather, similar to their takings claim, Plaintiffs assert only that the 2022 Order "divested [Non-Leasing Plaintiffs] of their property interest" in the Allotment. ECF No. 6 ¶ 70. At best then, they allege an "in effect" payment. There is no allegation, however, that Defendant took Non-Leasing Plaintiffs' mineral interests and sold them for money, or that money flowed directly or indirectly to Defendant as a result of the 2022 Order approving the leases. Indeed, the United States was not a party to the leases at issue. As other courts have held, the alleged loss of property alone does not constitute an "in effect" payment of money sufficient to state an illegal exaction claim. *See Mod. Sportsman*, 176 Fed. Cl. at 574.

Perhaps recognizing that no money went into Defendant's pockets, Plaintiffs further allege that Defendant "illegally required the [Non-Leasing Plaintiffs] to provide their property (mineral interests) without compensation to a third party (Reagan Smith, Inc.)." ECF No. 6 ¶ 71. Or, as Plaintiffs argue in their Sur-Reply, the 2022 Order "directed that the entire income produced by the lease, including the portion of royalties which should have been paid to non-leasing Plaintiffs, instead be paid only to the minority of owners who signed the lease." ECF No. 14 at 17. Whether the relevant third party is Reagan Smith or Leasing Plaintiffs, the facts alleged in the Amended Complaint do not plausibly state a third-party illegal exaction claim. Plaintiffs do not allege they paid money or its effect to Reagan Smith or Leasing Plaintiffs at Defendant's direction. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) (holding that airlines stated illegal exaction claim where government directed airlines to pay for expenses of asylum seekers (*e.g.*, hotel costs, meals, security, etc.) in contravention of statute obligating the

47

Government to bear such costs). Nor do they allege that Defendant directed Reagan Smith or any plaintiff to enter into the leases at issue. The only federal involvement in the leases occurred in relation to the lease approval proceeding, in which the Trial Attorney appeared pursuant to the Stigler Act. As explained above, the Act sets forth a mandatory lease approval process for private parties seeking to voluntarily convey property interests in restricted allotments. Framed in the proper context, the 2022 Order did not direct any action, so much as approve actions agreed to among private parties.

More fundamentally, however, even in cases where the Government expressly directed a third party to take an action that interfered with a plaintiff's property right, no illegal exaction claim is stated where the allegations do not concern *the payment of money* by the plaintiff. *See Piszel*, 833 F.3d at 1382 (explaining that government direction not to pay plaintiff his contractually-mandated severance was not an exaction "because there was no payment" of money by plaintiff). For the same reason, courts have found no exaction where government action allegedly resulted in lost opportunities for the plaintiff to make money. *See Eastport*, 372 F.2d at 1009 (holding illegal exaction theory cannot be premised on recovery of business losses); *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (2002) ("The doctrine of illegal exaction requires compensation for actual payments of money and has never, to the court's knowledge, been applied to compensate a plaintiff for lost opportunities to make money.").

Second, even assuming arguendo that Plaintiffs plausibly allege an exaction of money, directly or in effect, they have not plausibly alleged that the exaction was unlawful. As explained above, the Amended Complaint does not identify any statute, regulation, or constitutional provision with respect to the lease approval proceeding that Defendant plausibly violated. *See supra* § III.B; *see Boeing*, 968 F.3d at 1383. And since Plaintiffs base their illegal exaction claim

48

on the lease approval proceeding, *see* ECF No. 14 at 18, Plaintiffs cannot establish element two of an illegal exaction.  *See Boeing*, 968 F.3d at 1383; *see also Mod. Sportsman*, 176 Fed. Cl. at 573–74 (describing difference between self-money-mandating illegal exaction claims and illegal exaction claims based on a money-mandating source of law).  Just as the Amended Complaint does not sufficiently plead facts stating a breach of statutory trust duties based on the 2022 lease approval proceeding, it does not plausibly plead an illegal exaction claim based on that proceeding.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion to Dismiss (ECF No. 8).  This matter is **DISMISSED** under RCFC 12(b)(1) for lack of jurisdiction and RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED**.

Dated: April 28, 2026                              */s/ Kathryn C. Davis*
                                                   KATHRYN C. DAVIS
                                                   Judge

49